J-S32035-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| NATHANIEL BROWN | : | |
| | : | |
| Appellant | : | No. 507 EDA 2019 |

Appeal from the Judgment of Sentence Entered January 18, 2019,
in the Court of Common Pleas of Philadelphia County,
Criminal Division at No(s): CP-51-CR-0003397-2017.

BEFORE: KUNSELMAN, J., KING, J., and COLINS, J.[*]

MEMORANDUM BY KUNSELMAN, J.: Filed: October 29, 2020

Nathaniel Brown appeals from the judgment of sentence of time served to 23 months incarceration and three years of probation, after a trial court found him guilty of carrying a gun (1) in Philadelphia[1] and (2) without a license.[2] Pretrial, Brown moved to suppress the firearm, but the trial court denied relief. We reverse the denial of suppression and vacate the judgment of sentence.

At 9:50 p.m., on February 13, 2017, Officers Brent McCauley and Logan Johnson were in a marked patrol car in the 25th District of Philadelphia. Officer Johnson performed the frisk at issue. However, he **did not testify** at the

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 6108.

[2] 18 Pa.C.S.A. § 6106.

suppression hearing. His partner, Officer McCauley, testified instead and said that the 25th District is a "high crime, high drug, and high guns area." N.T., 5/21/18, at 7-8.

As the two officers rode in their patrol car, they saw a white Chevrolet Impala with three occupants: a driver, a front-seat passenger (Brown), and a back-seat passenger. The officers stopped the Impala, because they suspected it was not registered with the Pennsylvania Department of Transportation ("PennDOT"). They could not read the date on the temporary-registration tag hanging in the rear window, and their search for the car returned no record in PennDOT's database.

Officer McCauley activated his lights and siren, and the driver promptly pulled over. Officer McCauley approached the driver's window, and Officer Johnson approached Brown's window. Officer McCauley smelled burnt marijuana wafting from the car.

The officers ordered the driver and Brown to step out of the vehicle. Both men complied without issue or making any sudden movements. *See id.* at 24, 28. Office McCauley saw no weapons in the car or any bulges in the men's clothing. *See id.* at 27-28. When the occupants exited the vehicle, Officer McCauley immediately patted down the driver, while Officer Johnson immediately did the same to Brown.

Regarding the frisk of Brown, Officer McCauley testified as follows:

> Q:   [A]fter [the driver] and [Brown] both exited the
>       vehicle, what happened at that point?

> A:  My partner, at the time stated to me that [Brown] had a gun.  He said "Gun."  I immediately went over to him, as I was placing the driver in the back of my patrol car.
>
> Q:  And you said or indicated that Officer Johnson said "Gun."  Did you observe Officer Johnson – is it fair to say Officer Johnson would have frisked [Brown]?
>
> A:  Yes.
>
> Q:  And did you observe that?
>
> A:  As I was putting the passenger or the driver in my vehicle, I was walking up to help him when he said, "Gun."  Immediately when he said "Gun," I went up to my partner.  I also had to make sure the driver was secured first, as well as my vehicle, and then I went and placed [Brown] in handcuffs.

*Id.* at 15-16.

Next, the prosecutor asked Officer McCauley why he frisked the driver.

He answered, "For the smell of weed throughout the vehicle.  And even doing

a search as well."  *Id.* at 18.

The suppression court interjected, "For your safety?"  *Id.*

"Yes, for my safety," Officer McCauley responded.  But throughout that

testimony, there was never any evidence produced as to *Officer Johnson's*

*reason for frisking* Brown, because Officer Johnson did not testify.  Instead,

the prosecutor asked Officer McCauley whether it is routine practice for the

Philadelphia Police to frisk everyone whom they ask to exit a vehicle:

> Q:  [Y]ou frisking someone when you take them out of the vehicle, is that something that you *typically do*?
>
> A:  Yes.

> Q:   Have you received any training to do so when you remove someone from a vehicle?
>
> A:   Yes, in my police training.

*Id.* (emphasis added). Thus, according to Officer McCauley, the Philadelphia police typically frisk anyone whom they "take out of" a vehicle, even in a case like this, where the suspected offenses are nonregistration with PennDOT and marijuana use.

When Officer Johnson frisked Brown under this protocol, he found an unlicensed firearm. The officers then arrested Brown.

In his motion to suppress, Brown alleged, among other things, that Officer Johnson lacked reasonable suspicion under *Terry v. Ohio*, 392 U.S. I (1968), and its progeny to frisk him. The suppression court disagreed.

The court observed police may conduct an investigative detention, a.k.a. a *Terry* stop, if the officer has reasonable suspicion that a driver or passenger is armed and dangerous. The court explained that a frisk is only justified if the police can point to "specific and articulable facts indicating the person they intend to frisk may be armed and dangerous . . ." *Commonwealth v. Cooper*, 994 A.2d 589, 593 (Pa. Super. 2010). Analogizing this matter to *Commonwealth v. Simmons*, 17 A.3d 399, 403 (Pa. Super. 2011), the suppression court reasoned:

> the totality of the circumstances led Officer Johnson and Officer McCauley to reasonably believe that the driver, [Brown], or the back-seat passenger may have been armed or may have otherwise posed a risk to the officers' safety. First, the underlying incident involved a traffic stop. . . . The stop occurred around 9:50 p.m., in the 25th District of

- 4 -

Philadelphia, a "high crime, high drug, and high guns" area. (N.T. 5/21/18 at 7-8). In fact, Officer McCauley explained that "the whole entire 25th District is a violent crime area, high drugs, a lot of guns, thefts. We pretty much lead the city in most crimes in the city of Philadelphia." Although presence in a dangerous neighborhood, alone, is insufficient to support a finding of reasonable suspicion, it is a relevant consideration in a **Terry** analysis. **In re D.M.**, 781 A.2d 1161, 1163-64 (Pa. 2001).

The instant matter is distinguishable from **Simmons** in one aspect. In that case, officers observed the defendant make furtive or suspicious movements. Here, there was no testimony showing that any of the vehicle's occupants made furtive movements.

**Id.** at 8-9 (some citations and punctuation omitted).

Nonetheless, the suppression court believed additional factors created reasonable suspicion. The court stated:

Specifically, here, the two officers were outnumbered, as there were three male occupants in the stopped vehicle. . . . Additionally, the officers had reason to suspect that the vehicle's occupants possessed an illegal substance, as there was a strong odor of marijuana emanating from the vehicle. This court recognizes that the smell of marijuana, alone, does not necessarily support a Terry frisk. However, in conjunction with the other circumstances, this supported a finding of reasonable suspicion that the vehicle's occupants might be armed and dangerous.

**Id.** at 10.

After denying suppression, the court convicted Brown and sentenced him as detailed above. This timely appeal followed.

Brown asks this Court:

Whether the suppression court erred, because Officer Johnson frisked [him] unlawfully, inasmuch as [Officer McCauley] provided no specific and articulable facts to

- 5 -

support a reasonable suspicion that [Brown] was armed and dangerous, in violation of the federal and state constitutions?

Brown's Brief at 3.[3]

Brown challenges the frisk under both the Fourth Amendment to the Constitution of the United States and Article I, § 8 of the Constitution of the Commonwealth of Pennsylvania.[4] Brown argues that "no officer provided any specific and articulable facts to support a reasonable suspicion that [he] was armed and dangerous." *Id.* at 8. Indeed, he asserts that the police gave no reason for frisking him and emphasizes that the officer who actually frisked him did not testify to explain why he did so. According to Brown, Officer McCauley's general statement that he was worried for his safety, in response to the suppression court's question, was generalized and constitutionally deficient.

In reply, the Commonwealth relies on the analysis of the suppression court. It notes that an officer who asks a person to exit a vehicle may "conduct a quick frisk for weapons if [the officer] reasonably fears that the person with

---

[3] Brown's other appellate issues involve the constitutionality of the traffic stop and the scope of the *Terry* frisk. *See* Brown's Brief at 3. We need not address these claims, in light of our conclusion that the police lacked reasonable suspicion to frisk Brown.

[4] Brown does not assert greater protections under the state constitution. *See Commonwealth v. Edmunds*, 586 A.2d 887 (Pa. 1991) (articulating a four-part test for litigants to argue and for courts to analyze when facing state constitutional questions as being separate and distinct issues from those in the federal charter). We therefore deem Brown's state and federal constitutional claims to be coextensive and consider them together.

whom [the officer] is dealing may be armed and dangerous." Commonwealth's Brief at 9-10 (quoting *In re D.M.*, 727 A.2d 556, 557 (Pa. 1999)). "As the [suppression] court determined . . . the officers reasonably sought to protect their safety under the totality of the circumstances while conducting a car stop, at night, while outnumbered, in an area known for a high-crime rate with lots of guns." Commonwealth's Brief at 5.

We begin with our scope and standard of review. When, as in this case, there is a warrantless search, "determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal." *Ornelas v. United States*, 517 U.S. 690, 699, (1996). Thus, when police perform a warrantless search, including a *Terry* frisk, their actions are subject to the highest degree of appellate scrutiny. We accept the suppression court's factual findings, if competent evidence of record from the hearing supports them. *See Commonwealth v. Bradley*, 636 A.2d 619, 621 (Pa. 1994); *see also In re L.J.*, 79 A.3d 1073 (Pa. 2013). The "reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Ornelas* at 699.

Both the state and federal constitutions protect people from intrusions by the police into their privacy. The Constitution of the United States dictates that "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amnd. IV. Similarly, "The people shall be secure in their

persons, houses, papers, and possessions from unreasonable searches . . . ." Pa. Const. art. I, § 8. Thus, "warrantless search or seizure of evidence is . . . presumptively unreasonable under the Fourth Amendment and Article I, § 8, subject to a few specifically established, well-delineated exceptions." ***Commonwealth v. Luczki***, 212 A.3d 530, 546 (Pa. Super. 2019).

One exception is a constitutionally executed ***Terry*** frisk. To perform a permissible ***Terry*** frisk, an officer must possess reasonable suspicion that the person the officer is frisking is armed and dangerous. To rebut the presumption that the warrantless frisk of Brown was unreasonable, the Commonwealth needed to prove that "a reasonably prudent man in the circumstances [of Officer Johnson] would be warranted in the belief that his safety or that of others was in danger." ***Terry***, 392 U.S. at 20. The Commonwealth's suppression-hearing evidence failed to make that showing.

By way of example, we turn to a case that the Commonwealth cites in its brief, ***In re D.M.***, ***supra***. ***See*** Commonwealth's Brief at 10. In that case, a Philadelphia police officer received a radio report of an armed robbery in his vicinity. He arrived near the crime scene about one to two minutes later. The officer saw four men fitting the eyewitness's description of the robbers moving in a hurried fashion. When they saw the officer, they changed directions to avoid him. The officer caught up to and detained them. A ***Terry*** frisk ensued.

The Supreme Court of Pennsylvania held that the officer could, on those facts, detain the men to investigate whether they were involved in the robbery. The High Court then considered the separate issue of whether the

officer could pat them down. Affirming this Court and the suppression's rulings, the Supreme Court upheld the **Terry** frisk as constitutional.

Chief Justice Castille explained that "The officer's investigation could not have been safely pursued had he not patted the group down for weapons since the radio call alerted police to a **gunpoint robbery**." **In re D.M.**, 727 A.2d 556, 558 (emphasis added). "In light of the report that the robbery had been committed with a gun, 'a reasonably prudent man under the circumstances would be warranted in the belief that his safety or that of others was in danger.'" **Id.** (quoting **Terry** at 20). Thus, all three courts that reviewed the police actions in **D.M.** concluded the officer's concern for his safety was reasonable.

Here, unlike **D.M.**, police had no report of a violent crime or eyewitness identification of Brown to tie him to a violent act. Officers McCauley and Johnson stopped a vehicle to investigate its PennDOT registration. Officer McCauley testified to nothing **particular** about any of these three men – and especially not Brown – that would lead a reasonably prudent person to think that they were armed or dangerous. No danger arises from a temporary-registration tag being only partially taped to a rear window.

To assert reasonable suspicion that the three men were armed and dangerous, the Commonwealth and the suppression court relied upon five facts, none of which were particular as to Brown. Those general facts were: (1) geographical profiling (police have dubbed their 25th District of Philadelphia a "high crime" and "high drug" area); (2) the time of day (*i.e.*, 9:50 p.m.);

(3) the traffic stop itself; (4) the officers-to-suspects ratio; and (5) the smell of marijuana emanating from the vehicle. The suppression court deemed these five facts to be "the totality of the circumstances." Trial Court Opinion, 12/17/19, at 9. We disagree.

Additional facts comprised the totality of the circumstances that night, but the suppression court ignored them. It therefore erroneously failed to weigh those additional facts against the Commonwealth's claim that frisking Brown was based upon a particularized, reasonable belief that Brown, himself, was armed and dangerous.

First, as mentioned above regarding **In re D.M.**, there was no evidence or eyewitness report linking Brown to a crime of violence, such as a recent armed robbery. Indeed, the only crimes that the officers believed were afoot when they pulled the vehicle over was that the car may not have been properly registered with PennDOT because the temporary registration in the rear window was coming untaped.[5] **See** N.T., 5/21/18, at 11. Granted, Officer McCauley also testified that he observed the man in the rear seat rolling a blunt before the police began following the car, but (a) that is not a crime of violence, and (b) it was in no way linked to Brown or the degree of danger he presented to the police or others. **See id.** at 10-11. Brown was the front-seat passenger. Thus, when the officers directed Brown to exit the car, as far

---

[5] A temporary registration permit "shall be affixed to the extreme lower left-hand (diver side) inside corner of the rear window of a vehicle with the printed information visible from the outside." 75 Pa.C.S.A. § 1310.1(c).

as they knew, his greatest "offense" was riding in a vehicle with an improperly taped temporary registration tag. There was no indication that any violent crime was afoot.

Also, the Commonwealth provided no evidence or testimony as to why Officer Johnson frisked Brown. As previously indicated, Officer Johnson did not testify. Officer McCauley, who frisked the driver, saw no furtive movements by anyone in the car as the two police approached the vehicle. He reported no other facts that would warrant a reasonable person to believe that a weapon was present. Police saw no visibly apparent firearms or any bulges in the men's clothing that might give rise to an inference that they were carrying concealed guns.

Instead of identifying a particular risk that Brown presented, Officer McCauley explained that Officer Johnson patted him because that is what Philadelphia Police "typically do" during a traffic stop. N.T., 5/21/18, at 18. According to Officer McCauley, he received "training to do so when [police] remove someone from a vehicle." *Id.* Indeed, the Commonwealth relied solely on this testimony to justify the search of Brown. The assistant district attorney explained at the close of the suppression hearing that Officer McCauley "received training in the Philadelphia Police Academy, if you're going to take an individual out of a car, you can frisk . . . ." *Id.* at 47.

This is incorrect. The police *may not* frisk an individual, simply because they take him out of his car. This practice, if used as Officer McCauley claimed, is devoid of any individualized suspicion regarding the person being frisked.

- 11 -

Granted, under **Pennsylvania v. Mimms**, 434 U.S. 106 (1977), police may, as a matter of course and in the interest of their safety, "order the driver to exit the vehicle despite the lack of an articulable basis to believe that criminal activity is afoot or that the driver is armed and dangerous." **Commonwealth v. Brown**, 654 A.2d 1096, 1100 (Pa. Super. 1995). In **Mimms**, the Supreme Court explained that, once the vehicle is constitutionally stopped, "police have already lawfully decided that the driver shall be briefly detained; the only question is whether he shall spend that period sitting in the driver's seat of his car or standing alongside it." **Mimms**, 434 U.S. at 111. Standing beside one's vehicle during a traffic stop is a "mere inconvenience." **Id.**

Frisking someone, by contrast, is no "mere inconvenience." It is a bodily intrusion against his or her private person and individual liberty; hence, it is a search. At common law, it could constitute a battery.[6] Thus, the courts have never extended the rationale of **Mimms** and **Brown** to the act of frisking people after asking them to exit their cars, as Officer McCauley and the Commonwealth seemingly believe.

---

[6] "The definition of [a] battery [is] set forth in THE RESTATEMENT (SECOND) OF TORTS, § 18, as well as the battery definition included in Pennsylvania Suggested Standard Jury Instruction (Civil) 17.20 (providing that 'a battery is an act done with the intent to cause a harmful or offensive contact with the body of another and that directly or indirectly results in the harmful or offensive contact with the body of another.'" **Cooper ex rel. Cooper v. Lankenau Hosp.**, 51 A.3d 183, 190 n.6 (Pa. 2012) (some punctuation omitted).

Officer Johnson was not frisking Brown based upon a reasonable, individualized suspicion that Brown was armed or dangerous. At best, this record only shows that Officer Johnson frisked Brown as part of a typical practice of frisking everyone police ask to exit a vehicle. Thus, he had no individualized, reasonable suspicion to frisk Brown. All of the facts upon which the suppression court relied are part of the general risks police inherently face every day. However, they remain generally applicable facts that extend to every member of the public the police encounter. Those facts do not reflect upon anyone in particular or indicate that Brown, *himself*, might have been armed and dangerous.

Being in a "high crime" or "high gun" neighborhood at 9:50 p.m. does not indelibly brand everyone in that neighborhood as a danger to police or others. And as the public defender correctly argued in her closing, "if we use high crime, high drug, we would be frisking every single person that's in the City and County of Philadelphia." N.T., 5/12/18, at 43. Thus, while the police's characterization of a neighborhood may enhance suspicion if tied to some specific conduct by the frisked individual, it does not carry much weight in and of itself. Also, 9:50 p.m. is not so late to be driving in a major metropolitan center, such as Philadelphia, that to do so leads to a reasonable belief that the car's occupants are armed and dangerous.

Nor is there anything in the record to establish that a passenger riding in a car with a loosely taped temporary registration tag gives rise to such a reasonable belief. Furthermore, we disagree with the suppression court's

unsubstantiated conclusion that being in a car that smells of burnt marijuana increases the likelihood that one is armed or dangerous. ***See Commonwealth v. Grahame***, 7 A.3d 810, 811 (Pa. 2010) (concluding the Superior Court erred in presuming "guns follow drugs" to justify a protective search for weapons pursuant to ***Terry***). The Commonwealth offered no evidence connecting marijuana use to an increased risk of violence. And the actions of these men, calm and compliant, ***lessens*** the chances that they might have attacked the officers. Driving under the influence of marijuana would have made the driver unsafe to drive as a matter of law,[7] but this driver had pulled off the road immediately after the police activated their lights, thereby eliminating that threat by the time police frisked him and Brown. Thus, that crime no longer threatened anyone.

Lastly, the suppression court's contention that the police were outnumbered has some credence. But in light of the other facts of record, especially the lack of any real sign of danger from any of ***these three men*** or that they were attempting to escape or threaten the police, the police-to-suspect ratio carries little constitutional weight. The protections of the Fourth Amendment and Article I, § 8 do not evaporate if the police elect to engage a group of peaceful men who happen to outnumber law enforcement.

We hold that the frisk Officer Johnson executed on Brown violated both constitutions. Such police conduct did not conform to the requirements that

---

[7] ***See*** 75 Pa.C.S.A. § 3802(d). There is nothing of record to indicate that the driver was under the influence in this case.

- 14 -

police possess individualized, reasonable suspicion that the person frisked may be armed and dangerous. The Commonwealth failed to rebut the presumption that this warrantless search of Brown was unreasonable by proving that circumstances to support a **Terry** frisk existed. **See Luczki**, **supra**. The gun that police discovered and seized during this unconstitutional search is the fruit of the poisonous tree which the court below should have suppressed. **See Wong Sun v. United States**, 371 U.S. 471 (1963).

Judgment of sentence vacated. Order denying suppression reversed. Case remanded for further proceedings consistent with this decision.

Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/29/20